**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| PLEASANT GROVE DEVELOPMENT PARTNERS, LLC, a Utah limited liability company, CLARK CHAMBERLAIN, an individual, and EVE CHAMBERLAIN, in her capacity as the personal representative of THE ESTATE OF DOUGLAS CHAMBERLAIN, <br><br> Plaintiffs, <br><br> vs. <br><br> FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for AMERICA WEST BANK, L.C., BENTLEY WILSON, an individual, FIRST PRIORITY CAPITAL GROUP, LLC, a Utah limited liability company, and DOES I-X, whose true names are unknown, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:09-CV-00959-RJS <br><br> Judge Robert J. Shelby |
| FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for AMERICA WEST BANK, L.C., <br><br> Counterclaim Plaintiff, <br><br> vs. <br><br> PLEASANT GROVE DEVELOPMENT PARTNERS, LLC, a Utah limited liability company, CLARK CHAMBERLAIN, an individual, and EVE CHAMBERLAIN, in her capacity as the personal representative of THE ESTATE OF DOUGLAS CHAMBERLAIN, <br><br> Counterclaim Defendants. | |

This case arises in the aftermath of commercial loan dealings between America West

Bank, L.C., and Plaintiffs/Counterclaim Defendants Pleasant Grove Development Partners, LLC

(PGDP), and Clark and Douglas Chamberlain (the Chamberlains).  In 2008, PGDP obtained a $3,200,000 loan from America West (the Loan) secured by 9.78 acres of property in Pleasant Grove, Utah (the Property).  The Chamberlains personally guaranteed the Loan.

PGDP and the Chamberlains hoped America West would loan an additional $2,000,000 more to fund construction of improvements on the Property and to facilitate the sale of divided lots.  They claim that America West employee Bentley Wilson led them to believe more money would be loaned.  It was not.  The lots remained unsold, and PGDP defaulted on the Loan by March 2009.  America West recorded and delivered to PGDP a Notice of Default in April 2009.  Shortly thereafter, in the wake of the 2008 economic downturn, regulators shut down America West.  Defendant/Counterclaim Plaintiff Federal Deposit Insurance Corporation (FDIC) assumed the role of its receiver.[1]

In July 2009, PGDP and the Chamberlains recorded a *lis pendens* on the Property and sued to stop foreclosure proceedings initiated by FDIC.  They alleged that FDIC was not entitled to proceed with foreclosure and demanded that such efforts immediately cease.  The case was stayed to allow PGDP and the Chamberlains to complete the mandatory administrative claims process against FDIC.  After the stay lifted, FDIC filed a successful Motion for Summary Judgment, resulting in the dismissal of PGDP's and the Chamberlains' claims against FDIC in May 2011.

---

[1] Douglas Chamberlain died in 2011.  His wife, Eve Chamberlain, was substituted into this case on his estate's behalf.  (Dkts. 43 and 56.)  The other Defendants are First Priority Capital Group, LLC and Bentley Wilson.  Wilson was America West's Senior Vice President of Member Banking and the loan officer assigned to the Loan.  First Priority Capital Group is an entity owned by Wilson that got broker fees as part of the Loan.  Although added as Defendants in July 2010 (Dkt. 15), Wilson and First Priority Capital Group have not entered an appearance.

FDIC completed the foreclosure sale two months later, on July 11, 2011.  The Property sold for less than the amount of the Loan.  FDIC then filed Amended Counterclaims in this action to recover the deficiency.  In their Answer, PGDP and the Chamberlains assert two related affirmative defenses.  In both, PGDC and the Chamberlains contend that FDIC's claims are barred because FDIC unreasonably delayed completing the foreclosure sale in a declining real estate market, which caused the deficiency.  PGDP and the Chamberlains allege FDIC's actions represent a failure to mitigate FDIC's damages.  In essence, PGDP and the Chamberlains claim that FDIC should have foreclosed more quickly and that FDIC cannot recover damages resulting from its own delay.

FDIC filed a combined Motion for Partial Summary Judgment and Motion in Limine. (Dkt. 77.)  FDIC seeks an order that the two related mitigation defenses fail as a matter of law and excluding from trial any evidence related to mitigation, including testimony concerning the Property's higher market value prior to the date of the foreclosure sale in July 2011.  FDIC also asks the court to rule that it may recover, as part of its deficiency judgment, the interest PGDP and the Chamberlains incurred between the date of their default in March 2009 and the date of the foreclosure sale in July 2011.

The court held a hearing on FDIC's combined motion on January 6, 2014.  Peter Billings, Robert Crockett and Clint R. Hansen appeared for FDIC.  Stephen Hale and Holly Chamberlain appeared for PGDP and the Chamberlains.   At the hearing, the court granted FDIC's Motion for Summary Judgment and Motion in Limine.  This ruling articulates more fully the court's reasoning.

## FACTUAL BACKGROUND

The parties do not dispute the following facts for purposes of summary judgment.

In 2007, PGDP owned the Property and hoped to improve it into a six-lot, mixed-use development.  Decl. of Clark Chamberlain at 2-3 (Dkt. 88).  PGDP needed about $2,000,000 to construct improvements on the Property before it could sell divided lots.  *Id*. at 3.  At the time, it already owed about $3,000,000 on two existing loans: 1) a $2,500,000 loan from Selective Financing which had to be retired by the end of 2007 to avoid foreclosure; and 2) a $485,000 loan from MS3, LC.  *Id.* at 3; Amended Complaint at ¶ 38 (Dkt. 15).  PGDP decided to seek a new loan to refinance the Selective Financing loan, pay off the MS3 loan, and construct the improvements necessary to enable sales of divided lots on the Property.

On October 12, 2007, PGDP obtained from Far West Bank a proposal to lend $5,200,000, contingent on certain conditions being met.  Decl. of Clark Chamberlain at 3 and Exh. B (Dkt. 88-2).  But Far West could not commit to closing by the end of 2007.  *Id.*

On November 26, 2007, PDGP received a Letter of Intent from America West, stating an "intent, but not a commitment" to lend $5,200,000.  (Dkt. 88-3.)  But on December 26, 2007, America West delivered to PGDP a Loan Commitment for $3,200,000—with only a possibility of two additional $1,000,000 disbursements to be paid after the sale of lots five and six on the Property.  (Dkt. 88-4.)   PGDP and the Chamberlains were unhappy with this arrangement, as it left them without the cash necessary to construct improvements required to sell the lots in the first instance.  Decl. of Clark Chamberlain at 5.  In response, America West employee Bentley Wilson told them that America West had negotiated a deal with a purchaser interested in lots five and six to make deposits into escrow after the Loan closed to provide money needed to construct improvements.  *Id.*

4

On January 10, 2008, PGDP signed a Commercial Promissory Note (the Note) to America West in the principal amount of $3,200,000, a Commercial Construction Loan Agreement (Loan Agreement), and a Commercial Construction Deed of Trust (Deed of Trust). (Dkts. 77-2, 77-3 and 77-4.)  The Note incorporates the terms of the Loan Agreement and Deed of Trust, stating that "[i]f this Note is secured by a security agreement, deed of trust, trust deed, security deed or loan agreement of even or previous date, it is subject to all the terms thereof."  Clark and Douglas Chamberlain executed personal guaranties for the Loan the same day.  (Dkt. 77-3 at 11-12.)  PGDP and the Chamberlains did not draft or review in advance of the closing the documents they signed.  They did not have an attorney with them at the closing, and no one explained to PGDP or the Chamberlains the meaning of the 'boilerplate' language in the documents.  The documents were presented on a "take it or leave it basis."  Decl. of Clark Chamberlain at 6.

Before closing, America West negotiated with MS3 and agreement to accept a partial payoff of $267,711.87 on its note securing a second position trust deed, and to take the remaining $217,288.13 when PGDP sold its first lot.  But after closing the Loan, PGDP did not obtain more money, and was unable to sell any lots.  By September 2008, PGDP had fallen behind on its loan payments.  Decl. of Clark Chamberlain at 9.  MS3 filed a Notice of Default and sought to foreclose on its second position deed of trust.  America West also notified PGDP that the Loan was "in or approaching default," was due and payable in full, and began to threaten foreclosure.  *Id*.; Exh. H (Dkt. 88-8).

On December 22, 2008, PGDP met with officials from America West to discuss the situation.  During that meeting, PGDP executed a Change in Terms Agreement providing: 1) the Loan's principal at that time was $3,197,493.69; 2) America West would forebear a few months

of interest payments (to allow PGDP time to secure alternative financing); 3) the Loan's maturity date would advance from July 6, 2009, to April 6, 2009; 4) "[e]xcept as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidencing or securing the obligation(s), remain unchanged and in full force and effect"; and 5) the Agreement and related loan documents are the "final expression of the agreement between Lender and Borrower and may not be contradicted by evidence of any alleged oral agreement." (Dkt. 77-5.)  That same day, the Chamberlains both signed a Commercial Guaranty agreement, personally guaranteeing the Loan's payment.  (Dkts. 77-6 and 77-7.)[2]

But no Loan payments were made after March 2009.  Decl. of Clark Chamberlain at 10. On April 20, 2009, America West delivered to PGDP a Notice of Default dated April 13, 2009, notifying it that the Property may be sold as early as July 2009.  On May 1, 2009, however, regulators closed America West, and FDIC was appointed as its receiver.

PGDP and the Chamberlains filed this suit against FDIC on July 21, 2009 in Utah's Fourth Judicial District Court.  PGDP and the Chamberlains asserted fourteen causes of action against America West and FDIC, challenging the enforceability of the loan agreements and guaranties at issue.  PGDP and the Chamberlains alleged that FDIC could not legally proceed with foreclosure.  For example, in their Sixth Cause of Action, for Breach of Contract, PGDP and the Chamberlains allege that America West breached a contract with them "by initiating foreclosure proceedings."  PGDP and the Chamberlains requested a court order compelling the

---

[2] The Note, Loan Agreement, Deed of Trust, Change in Terms Agreement, and Commercial Guaranties are collectively referred to as the Loan Documents.

immediate "ceasing and desisting of all foreclosure efforts."  (Dkt. 1-2 at 31.)  PGDP and the Chamberlains also noted that they had filed a *lis pendens* on the Property.  (Dkt. 1-2 at 39.)

The FDIC removed this case to federal court on October 26, 2009.  (Dkt. 1.)  This court stayed the case in January 2010 to allow PGDP and the Chamberlains to exhaust the administrative claims process required to assert causes of action against FDIC.  (Dkt. 8.)  While the case was stayed, FDIC recorded a second Notice of Default and Election to Sell on February 9, 2010.  The stay was lifted on April 29, 2010.  (Dkt. 12.)

Three months later, PGDP and the Chamberlains filed an Amended Complaint, adding Wilson and First Priority Capital Group as Defendants.  (Dkt. 15.)  PGDP and the Chamberlains also added claims that the Loan was unconscionable and voidable to the extent that it did not evidence an agreement to lend $5,200,000.  (Dkt. 15 at 40, 53.)  They continued to allege that foreclosure proceedings on the Property amounted to a breach of the parties' contract, and that they were entitled "to specific performance of the contract, including, without limitation, immediately ceasing and desisting on all foreclosure efforts . . . ."  (Dkt. 15 at 41-42.)  PGDP and the Chamberlains again emphasized the *lis pendens* they recorded against the Property. (Dkt. 15 at 51); *see Notice of Lis Pendens*, recorded July 21, 2009, in Utah County, Utah (Dkt. 15-8).  FDIC answered the Amended Complaint, filed a counterclaim for Breach of Commercial Guaranty against the Chamberlains, and reserved the right to bring a counterclaim for deficiency after any foreclosure sale.  (Dkt. 16.)

On February 7, 2011, FDIC moved for summary judgment on all of the claims PGDP and the Chamberlains had asserted against it.  (Dkts. 20 and 21.)  On May 4, 2011, this court, Judge Ted Stewart, granted FDIC's motion.  (Dkt. 35.)  The court concluded that pursuant to the so-

called '*D'Oench* doctrine,'[3] codified in 12 U.S.C. § 1823(e), America West and FDIC could not

be charged with an enforceable obligation to lend $5,200,000.[4]  Two months after the court's

ruling, on July 11, 2011, the foreclosure sale took place, and the Property was sold.

On September 26, 2011, FDIC filed an Amended Counterclaim, reasserting its claims for

Breach of Commercial Guaranty against the Chamberlains, and including a new claim for Breach

of Note and Modification against PGDP.  (Dkt. 41.)  On April 4, 2013, after Douglas

Chamberlain passed away, FDIC amended these claims and asserted a claim for Breach of

Commercial Guaranty against Clark Chamberlain and Eve Chamberlain, as Personal

---

[3] *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447 (1942).

[4] Section 1823(e)(1), *Agreements against interests of Corporation, in general,* provides:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

The court concluded that two loan documents executed by America West did not create an enforceable agreement to lend $5,200,000.  One, a Letter of Intent, evidenced an "intent, but not a commitment" to make a loan in the amount of $5,200,000.  (Dkt. 35 at 7.)  A subsequent Loan Commitment provided that $3,200,000 would be loaned, with the possibility of additional disbursements if proceeds from the sale of two lots were deposited with America West.  The Loan Commitment was never signed by PGDP or the Chamberlains, and in any event, the sale of the two lots was never completed.  (*Id.*)  The court also noted that PGDP and the Chamberlains had conceded that their Fraud in Factum claim failed.  (*Id.*)

Representative for the Estate of Douglas Chamberlain.  (Dkt. 73.)  FDIC seeks to recover a

deficiency judgment of $1,840,243.92, plus interest, attorney fees, and costs, pursuant to the

Note and Modification executed by PGDP and guaranteed by the Chamberlains.  *Id.*

In their Answer to FDIC's Second Amended Counterclaim, PGDP and the Chamberlains

assert as their Fourth and Fifth Affirmative Defenses:

> FDIC's claims are barred inasmuch as it unreasonably delayed completing the
> foreclosure of its trust deed in a declining real estate market and thereby failed to
> mitigate its damages.

> FDIC's claims are barred due to its negligence in delaying foreclosure of its trust
> deed in a declining real estate market.

*Plaintiffs' Amended Answer to FDIC's Second Amended Counterclaim* at 9 (Dkt. 80).

Related to these mitigation defenses, PGDP and the Chamberlains have designated two

experts to testify in this case.  First, Jonathan Cook, MAI, submitted reports opining that the

Property's value as of June 9, 2010—the date when FDIC allegedly could have sold the Property

under the second Notice of Default—was $4,230,000, while the Loan's outstanding balance was

$3,837,429.  (Dkts. 64-1, 87-1.)  Mr. Cook opines that on the date of the actual foreclosure

sale—July 11, 2011—the Property's value was about $400,000 less.  (Dkt. 70-1.)  Second,

Defendant Clark Chamberlain has submitted a report calculating the interest accrued under the

Note between June 9, 2010 and the July 11, 2011 foreclosure sale was $702,671.92.  (Dkts. 64-2,

88-12.)  FDIC moves to exclude these experts and their opinions at trial.

## DISCUSSION

### I.  FDIC's Motion for Partial Summary Judgment.

This court may grant FDIC's Motion for Partial Summary Judgment on PGDP's and the

Chamberlains' mitigation defenses only if "there is no genuine dispute as to any material fact

and [FDIC] is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).   The parties here

do not dispute any material facts.  In viewing the uncontroverted evidence before it, the court makes all reasonable inferences in the light most favorable to PGDP and the Chamberlains, the nonmoving parties.  *See N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

Applying these principles, the court concludes that the mitigation defenses asserted by PGDP and the Chamberlains fail as a matter of law, and that FDIC is entitled to partial summary judgment.  The court rejects the central argument advanced by PGDP and the Chamberlains: that America West/FDIC owed and may have breached a duty to mitigate—essentially avoid—the deficiency FDIC now seeks to recover following the July 2011 foreclosure.  (Dkt. 89 at 25.)  The court concludes the asserted mitigation defenses are inapplicable in this contract case involving an absolute promise to pay.  Further, PGDP and the Chamberlains have offered no competent evidence that FDIC breached any possible duty to mitigate by delaying the timing of the foreclosure sale unreasonably or in bad faith.  Finally, even if PGDP and the Chamberlains had offered such evidence, they have contractually waived under the Loan Documents their ability to argue FDIC failed to mitigate damages arising from the foreclosure.  Contrary to the arguments of PGDP and the Chamberlains, their waiver is not unconscionable and unenforceable.  Accordingly, FDIC is entitled to partial summary judgment on the mitigation defenses.

**A.  The mitigation doctrine and related affirmative defenses are inapplicable in this contract case where there is an absolute promise to pay.**

Under Utah law, the amount of damages otherwise recoverable by one claiming breach of contract may be reduced if a claimant "failed to properly mitigate its damages." *John Call Engineering, Inc. v. Manti City Corp.,* 795 P.2d 678, 680 (Utah App. 1990).  This duty to mitigate "generally operates to prevent one against whom a wrong has been committed from recovering any item of damage arising from the wrongful conduct which could have been

avoided or minimized by reasonable means." *Id.* (citations omitted).  Parties asserting a mitigation defense bear the burden to show "with specificity why the damages sought [by the non-breaching party] are not proper because of . . . a failure to reasonably mitigate." *Id.* at 681.

The Utah Court of Appeals has noted that "in a contract case, the mitigation doctrine would have the most applicability to claims for special or consequential damages rather than to general damages." *Id.* at 681.  Further, this court, applying Utah law, has concluded that in cases where, as here, there is an absolute promise to pay, "the duty to mitigate damages is not applicable . . . ." *Bank of the West v. Sabey,* 2012 WL 4325642, at *12 (D.Utah Sept. 19, 2012) (citing 22 Am.Jur.2d *Damages* § 358) (other citations omitted)); *see also Hewitt v. Community & Southern Bank*, 2013 WL 6017427, at *3 (Ga.App. Nov. 14, 2013) (rejecting borrower's mitigation defense to claim for breach of promissory note; noting that statutory duty to mitigate could not apply where there was an absolute promise to pay); *Wells Fargo Bank, N.A. v. Riverview East Windsor, LLC,* 2010 WL 5610864, at *7 (striking borrower's mitigation defense; noting that "concept of mitigation of damages is inapplicable to a mortgage foreclosure action where the damages consist of a sum certain, the repayment of which has been agreed to by the defendant maker of a promissory note." (citations omitted)).  Notably, PGDP and the Chamberlains have not identified a case in which a duty to mitigate was enforced against a lender for failing to conduct a foreclosure sale at an earlier time to avoid a deficiency resulting from a declining real estate market.  This is not surprising, as lenders ordinarily have strong economic interests to maximize recovery in foreclosure proceedings, and to minimize or eliminate any need to pursue deficiencies through costly and uncertain collection efforts.

For these reasons, this court concludes that the duty to mitigate—including the affirmative defenses asserted by PGDP and the Chamberlains—is inapplicable here.

**B. PGDP and the Chamberlains present no competent evidence suggesting that FDIC delayed the foreclosure sale unreasonably or in bad faith.**

Even if the mitigation doctrine could otherwise apply in this context, the court concludes that in light of the undisputed facts in this case, it would necessarily fail as a matter of law. Whether a party has acted reasonably or negligently presents an issue usually reserved for a fact finder and not determined at summary judgment. But "to submit the issue [of mitigation] to the jury, there must be competent evidence to show that the plaintiff failed to take reasonable efforts to mitigate his damages." *John Call Engineering, Inc.,* 795 P.2d at 680 (citations omitted). PGDP has failed to present competent evidence that FDIC unreasonably failed to mitigate its damages—the deficiency FDIC now seeks to recover.

PGDP and the Chamberlains argue that FDIC might have conducted a foreclosure sale as early as July 9, 2009 or perhaps July 10, 2010, and that its failure to do so was an unreasonable failure to mitigate damages, or was alternatively in breach of FDIC's duty of good faith and fair dealing.[5] But within days of July 9, 2009, PGDP and the Chamberlains had: 1) recorded a *lis pendens* on the Property, and 2) filed suit against America West and FDIC seeking to invalidate the Loan Documents and requesting a court order that FDIC must immediately cease any efforts to proceed with a foreclosure sale. Those claims and the *lis pendens* were reiterated in an

---

[5] The court has already granted summary judgment on Plaintiffs' affirmative cause of action for Breach of the Covenant of Good Faith and Fair Dealing. (Dkt. 35.) In that cause of action, PGDP and the Chamberlains had alleged that FDIC was liable to them for initiating the very foreclosure proceedings they now complain FDIC should have concluded much earlier. (Amended Complaint, Dkt. 15 at 44-45.)

Amended Complaint filed in July 2010. [6]  FDIC then filed a motion for summary judgment to dispose of the causes of action against it in early 2011.  When the court granted that motion in May 2011, FDIC promptly moved forward with a foreclosure sale in July 2011.

PGDP and the Chamberlains offer no evidence—aside from this bare timeline—to suggest that FDIC was unreasonable in waiting for the legal uncertainty over the Property to be resolved before it staged the foreclosure sale.  Under these circumstances, the timeline alone does not amount to evidence of an unreasonable or bad faith failure to mitigate damages, and cannot defeat summary judgment.[7]

## C.  Under the Loan Documents, PGDP and the Chamberlains waived the mitigation defenses.

FDIC argues that under the terms of the Loan Documents, PGDP and the Chamberlains waived their ability to assert that FDIC improperly delayed its foreclosure sale of the Property in a declining real estate market, and thus failed to mitigate its damages.  PGDP and the Chamberlains concede that the Loan Documents give FDIC the right to foreclose, but argue they have not waived the right to argue that FDIC unreasonably exercised its right by delaying the foreclosure sale.  This argument fails.  Under the broad waiver language in the Loan Documents, both PGDP and the Chamberlains have waived their ability to assert a mitigation of damages defense based on a delayed foreclosure.

---

[6] FDIC argues in its Reply Memorandum in Support of Motion for Partial Summary Judgment and Motion in Limine (Dkt. 94) that PGDP and the Chamberlains should be equitably estopped from asserting the mitigation defenses in view of the prior positions they have taken in this litigation.  The court need not consider this argument, which was raised for the first time in FDIC's Reply.

[7] PGDP and the Chamberlains further offer the court no evidence that FDIC timed the July 2011 foreclosure sale to enhance its own profit, to harm PGDP or the Chamberlains, or as a result of any negligence by an employee.

The recent *Sabey* case in this District is instructive.  2012 WL 4325642, at \*11.  In *Sabey,*
Judge Dee Benson concluded that a guarantor had, by signing a personal guaranty with language
nearly identical to the guaranties signed by the Chamberlains,[8] waived the ability to assert a
mitigation of damages defense alleging that the lender had waited to foreclose in a declining
market and had refused to accept an offer of a deed in lieu of foreclosure.  *Id.*  While principles
of contract construction favor guarantors, the language of the "broad waivers defeat[ed] [the
guarantors'] mitigation of damages defense."  *Id.*

---

[8]In *Sabey,* the critical language in the personal guaranty stated:

> Guarantor waives any right to require Lender . . . (D) to proceed directly against
> or exhaust any collateral held by Lender from Borrower, any other guarantor, or
> any other person . . . (F) to pursue any other remedy within Lender's power; or
> (G) to commit any act or omission of any kind, or at any time, with respect to any
> matter whatsoever.

> \* \* \*

> Guarantor also waives any and all rights or defenses based on suretyship or
> impairment of collateral including, but not limited to, any rights or defenses
> arising by reason of (1) any election of remedies by Lender . . .

> \* \* \*

> Guarantor also waives and agrees not to assert or take advantage of . . . (2) the
> release or surrender of any security held for the payments of the Indebtedness; or
> (3) any defense based upon an election of remedies (including, if available, an
> election of remedies to proceed by non judicial foreclosure) . . .

> \* \* \*

> Guarantor further waives and agrees not to assert or claim at any time any
> deductions to the amount guaranteed under this Guaranty for any claim of setoff,
> counterclaim, counter demand, recoupment or similar right, whether such claim,
> demand or right may be asserted by the Borrower, the Guarantor, or both.

2012 WL 4325642, at \*11.

The court concludes that the nearly identically broad language in the guaranties signed by the Chamberlains in the Loan Documents has the same effect as in *Sabey*—to preclude the Chamberlains' ability to assert mitigation defenses.  First, the Note PGDP signed provides in a section titled "GENERAL WAIVERS":

> No failure or delay on the part of Lender . . . shall operate as a waiver of such power or right, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

Note at 2 (Dkt 77-2).

Second, under the "Lender's Rights and Remedies" Section of the Loan Agreement PGDP signed, America West "may, but is not required to, exercise any or all of the rights under this Agreement . . . ."[9]  Further,

> Lender is not obligated to undertake any discretionary power granted in this Agreement, but if Lender should exercise a discretionary power, Lender shall have no liability to Borrower for the sufficiency or adequacy of any such action. Borrower releases Lender, its officers, and its agents from any and all liability for negligence for acts or omissions to act and further agrees to indemnify and hold Lender harmless for any such negligence on the part of Lender, its officers, its agents, assigns and successors.
>
> * * *
>
> No failure or delay on the part of Lender or the holder of any note in the exercise of any power or right . . . shall operate as a waiver of such power or right, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

Loan Agreement at 9, 10 (Dkt. 77-3).

Third, the Trust Deed executed by PGDP provides:

> No delay or failure of lender to exercise any right, remedy, power or privilege herein shall affect that right, power or privilege nor shall any single or partial

---

[9] The term "Rights and Remedies" is defined in the Loan Agreement as "the rights and remedies given to Lender under this Agreement upon the occurrence of an Event of Default."  (Dkt. 77-3 at 2.)

exercise thereof preclude the exercise of any right, remedy, power or privilege . . .
.

> Grantor waives . . . defenses based upon suretyship, any defense arising from
> any election by Lender under the United States Bankruptcy Code, Uniform
> Commercial Code . . . or other applicable law or in equity . . . .

Trust Deed at 5 (Dkt. 77-4).

Finally, the Change in Terms Agreement signed by PGDP, states:

> Lender may delay or forego enforcing any of its rights or remedies under this
> Agreement without losing them . . . . All such parties agree that Lender may . . .
> impair, fail to realize upon or perfect lender's security interest in the collateral.

Change in Terms Agreement at 2 (Dkt. 77-5).

Under these provisions, the court concludes that PGDP and the Chamberlains waived any available mitigation defense.

### D. Plaintiffs have failed to establish either substantive or procedural unconscionability of the waivers.

PGDP and the Chamberlains attempt to avoid the effect of their waivers by arguing that the Loan Documents are unenforceable under the equitable doctrine of unconscionability.   They contend that the terms of the Loan Documents are both substantively unconscionable and that the agreement's formation was unfair—amounting to "procedural unconscionability" under Utah Law.  *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998) (citations omitted). PGDP and the Chamberlains allege in their Seventh Affirmative Defense to FDIC's Second Amended Counterclaim that "FDIC's claims are barred due to the unconscionability of the terms of the Loan Documents."  (Dkt. 75 at 9.)  Strictly speaking, this defense relates to substantive unconscionability.  In opposing FDIC's Motion, however, PGDP and the Chamberlains

emphasize the alleged unfairness of the circumstances leading up to their signing the Loan Documents.[10]

While substantive unconscionability alone may render an agreement unenforceable, "procedural unconscionability without any substantive imbalance will rarely" lead to such a result. *Ryan*, 972 P.2d at 402 (citations omitted).  PGDP and the Chamberlains "bear[] a heavy burden" to establish unconscionability that can be met only with clear and convincing evidence. *Id.* (citations omitted).  This is because the law generally permits parties to enter into even undesirable agreements—"unreasonable contracts or contracts leading to a hardship on one party." *Id*. (citations omitted).   Plaintiffs must show they lacked "meaningful choice" and that the Loan Agreement terms are "unreasonably favorable to [FDIC]." *Id*. (emphasis and citations omitted).

The court first evaluates whether the terms of the Loan Documents are substantively unconscionable.  The court can so conclude only if it finds the terms "so one-sided as to oppress or unfairly surprise an innocent party" or if they impose "an overall imbalance in the obligations and rights . . . according to the mores and business practices of the time and place.'" *The*

---

[10] PGDP and the Chamberlains claim that before the Loan Commitment was delivered to them on December 26, 2007, they believed from reading the non-binding Letter of Intent that they were going to get $5,200,000 from America West, and had given up the chance to obtain a loan from Far West—a loan that would not close by the end of the year.  They needed $5,200,000 because they had a large existing loan that would go into default if they did not get financing, and needed money for construction in order to sell lots.  In that position, PGDP and the Chamberlains claim they had no choice but to take the America West loan—particularly because Wilson reassured PGDP and the Chamberlains that America West would, one way or another, ensure that PGDP obtained an additional $2,000,000 to construct needed improvements.  They emphasize that the Loan was in a form for a construction loan—yet as it was drafted, there was no way to accomplish the construction objective.  It did not give PGDP enough money to do anything but refinance existing debt.

*Cantamar, L.L.C. v. Champagne*, 142 P.3d 140, 152 (Utah App. 2006) (citations omitted).  The court reviews the terms "in the light of the general commercial background and the commercial needs of the particular trade or case."  *Resource Mgmt.Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1042 (Utah 1985).  Under these principles, the court concludes that PGDP and the Chamberlains have failed to present clear and convincing competent evidence that the Loan Documents are one sided, unfairly surprising, and oppressive.

First, the court notes that the unconscionability arguments advanced by PGDP and the Chamberlains to defeat the waivers are similar to those that PGDP and the Chamberlains alleged in their Amended Complaint in their claim for 'Breach of Contract-Unconscionability,' which was previously dismissed by this court on summary judgment.  PGDP and the Chamberlains may not now resuscitate that claim as a defense to enforcement of the above-discussed waivers.

But even if they could, the facts set forth by PGDP and the Chamberlains to support their claim of substantive unconscionability focus on the events surrounding the Loan formation, not the terms of the Loan itself.  They suggest that PGDP and the Chamberlains were in a very difficult financial position with no other options, and that they had been assured that money in addition to that loaned under the agreement would be forthcoming.  These facts do not lead the court to conclude that the terms of the resulting Loan were so one-sided and oppressive as to be substantively unconscionable.

The court likewise concludes that PGDP and the Chamberlains have failed to establish that the formation of the Loan agreement was procedurally unconscionable.  To find this type of unconscionability, the court must conclude that "there was overreaching by a contracting party occupying an unfairly superior bargaining position" after considering the following factors:

> (1) whether each party had a reasonable opportunity to understand the terms and conditions of the agreement; (2) whether there was a lack of opportunity for

18

meaningful negotiation; (3) whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position; (4) whether the terms of the agreement were explained to the weaker party; (5) whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement; and (6) whether the stronger party employed deceptive practices to obscure key contractual provisions.

*Ryan*, 972 P.2d at 403 (citations omitted).

Here, PGDP and the Chamberlains contend that America West delayed negotiations leading up to the closing, leaving PGDP with no choice but to take the Loan. They also argue that they didn't see the actual Loan Documents in advance of the closing, no one explained the meaning of the Loan Documents' 'boilerplate' provisions, and they had no attorney with them at closing.

But these facts do not establish procedural unconscionability in this case. The Loan Documents appear to contain language common in commercial loan agreements. PGDP and the Chamberlains were experienced in commercial real estate, having taken out at least two other large commercial loans before the events in this case occurred. There is no evidence that PGDP and the Chamberlains were prevented from reading the Loan Documents at the time of closing, or that they did not understand them. PGDP had investigated a possible loan with Far West and other lenders, but opted to negotiate only with America West. It was aware two weeks before closing that it would not be getting a $5,200,000 loan as it had hoped. It nevertheless went forward with the Loan. And although it did not choose to bring an attorney to the closing, there is no evidence that it could not have done so.

The court thus concludes that PGDP's and the Chamberlains' attempt to avoid the effect of the waivers in the Loan Documents on grounds of unconscionability fails.

## II.      FDIC'S Motion in Limine.

FDIC seeks an order excluding from trial any evidence related to the failed mitigation of damages defenses asserted by PGDP and the Chamberlains.  This includes expert testimony concerning the value of the Property at any date prior to the date of the actual foreclosure sale on July 11, 2011.  Under Utah law, the date of the sale is the date relevant to determining the fair market value of property that has been sold at foreclosure.  Utah Code Annotated § 57-1-32, *Sale of trust property by trustee*, provides:

> [A]n action may be commenced to recover the balance due upon the obligation for which the trust deed was given as security, and in that action the complaint shall set forth the entire amount of the indebtedness that was secured by the trust deed, the amount for which the property was sold, and the fair market value of the property at the date of sale.

Under the statute, the court is charged with finding "the fair market value of the property at the date of the sale," and its judgment is limited to no more than "the amount by which the amount of the indebtedness with interest, costs, and expenses of sale, including trustee's and attorney's fees, exceeds the fair market value of the property as of the date of the sale."  UTAH CODE ANN. § 57-1-32.[11]  Under Section 57-1-32, and because the mitigation defenses fail as a matter of law, FDIC contends that the expert testimony offered by PGDP and the Chamberlains concerning the Property's fair market value at a time other than the date of the actual foreclosure sale is irrelevant and should be excluded.

Rule 702, Federal Rules of Evidence, requires the court to act as a gatekeeper to assure that expert testimony is both reliable and relevant.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

---

[11] Fair market value is determined by asking what a "willing, knowledgeable buyer would be willing to pay for property sold at a trustee's sale," including "any prior encumbrances."  *Capital Assets Financial Services v. Jordanelle Devel.*, LLC, 247 P.3d 411, 414 (Utah App. 2010).

Expert testimony may be admissible if "the expert's proposed testimony is [specialized] knowledge, and . . . the evidence 'fits' the current issue and will assist the jury." *Daubert*, 509 U.S. at 592.  In addition to reliability, the court must evaluate the offered testimony's relevance by inquiring "whether proposed testimony is sufficiently relevant to the task at hand." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005).

Because the court has concluded that PDGP and the Chamberlains have provided no basis to assert a mitigation of damages defense, and because they have waived their ability to assert such a defense, PDGP and the Chamberlains may not present evidence relevant only to a mitigation defense.   The court concludes that expert testimony concerning the value of the Property on a date other than July 11, 2011, the date of the foreclosure sale, is not admissible for purposes of arguing that FDIC unreasonably delayed the sale of the Property or otherwise failed to mitigate its damages.

## **CONCLUSION**

For the foregoing reasons, the court GRANTS FDIC's Motion for Partial Summary Judgment and Motion in Limine.  (Dkt. 77.)

Dated this 11th day of August, 2015.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge